UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                     Case No. 12-20092
                                                 Honorable David M. Lawson

v.

HUSSAIN N. ABDULKADIN,

        Defendant.
_____/

**OPINION AND ORDER DENYING MOTION TO SUPPRESS EVIDENCE**

Police officers in Detroit, Michigan arrested defendant Hussain Abdulkadin at his home on November 30, 2011 and then conducted a protective sweep of his house, during which they discovered two firearms: a Glenfield Model 60, .22 caliber long rifle with a missing serial number and a black Ruger .22 caliber rifle with serial number 353-31112. The defendant was charged with being a felon in possession of firearms, and he has filed a motion to suppress the guns because they were seized without a warrant. In *Maryland v. Buie*, 494 U.S. 325 (1990), the Supreme Court held that protective sweeps are allowable "as a precautionary matter and without probable cause or reasonable suspicion, [of] . . . spaces immediately adjoining the place of arrest from which an attack could be immediately launched," and of other spaces if the officers have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334. The Court held an evidentiary hearing on June 19, 2012 at which it concluded that the government failed to establish articulable facts that would justify a more pervasive protective sweep under the second prong of *Buie*'s holding. The Court then ordered the parties to submit additional briefs on whether the protective sweep was justified under *Buie*'s first

prong, that is, whether the bedroom in which the guns were found constituted a space immediately adjoining the place of arrest. The parties submitted supplemental briefs on July 8, 2012, and the matter is ready for decision.

I.

According to the testimony, on November 30, 2011 at approximately noon, Officers Eric Smigielski, Matthew Miller, and Jesse Johns of the Detroit Police Department went to 6361 St. Mary's Street, Detroit, Michigan, to serve an arrest warrant for drug possession on the defendant. The officers knocked and announced their presence. The defendant's wife, Nermil Ghali, answered the door. Officer Miller asked her if the defendant was home and she replied "No" as she attempted to pull the door closed. From the doorway, Miller looked over Ghali's shoulder and saw the defendant standing in the living room of the house. The officers entered the premises and arrested the defendant in the living room without incident. Defendant Abdulkadin was taken into custody in the living room. Officer Smigielski then walked the defendant's wife to the back room of the house to retrieve a coat and shoes for the defendant. As he walked her toward the bedroom area, he conducted a protective sweep. When Officer Smigielski entered the southwest, back bedroom, he observed in plain view inside the closet a .22 caliber long rifle and an open black rifle case. Inside the open rifle case he saw a black rifle. Officer Johns also swept the upstairs bedroom but apparently found no incriminating evidence.

Officer Miller testified that the defendant's home was approximately 900 square feet, and that immediately upon entering the house, one encounters the living room, a kitchen and dining room to the left of the living room, and a hallway leading to the back bedrooms behind the living room. Officer Smigielski testified that the hallway to the bedroom area was approximately ten to

fifteen feet, or two to three strides. Smigielski also testified that the stairway for the upstairs bedroom was located next to the southwest bedroom. Officer Johns testified that the southwest bedroom was approximately six feet down the hall from the living room, and that he could see Officer Smigielski enter the southwest bedroom from where he was standing in the living room.

The officers admitted at the hearing that none of them knew of any reason to suspect that others might be present in the house at the time of the arrest.

II.

It is well established that warrantless searches of a home are presumptively unreasonable. *El Bey v. Roop*, 530 F.3d 407, 419-20 (6th Cir. 2008) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)); *see also United States v. Archibald*, 589 F.3d 289, 295 (6th Cir. 2009) (noting that the government bears the burden of proving the constitutionality of a protective sweep). However, the Supreme Court created a limited exception authorizing police officers "making arrests in the home to conduct a 'protective sweep' — a 'quick and limited search of the premises, incident to an arrest and conducted to protect the safety of the police officers and others.'" *United States v. Stover*, 474 F.3d 904, 911 (6th Cir. 2007) (quoting *Buie*, 494 U.S. at, 327). The *Buie* Court pronounced the following two holdings:

> First, during a search incident to an arrest occurring inside a home, officers may "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Second, officers may conduct a search more pervasive in scope when they have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."

*United States v. Colbert*, 76 F.3d 773, 776 (6th Cir.1996) (quoting *Buie*, 494 U.S. at 334) (internal citations omitted). In *United States v. Archibald*, 589 F.3d 289 (6th Cir. 2009), the Sixth Circuit further explained *Buie*:

> The first type of sweep requires no probable cause or reasonable suspicion, while the second requires articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. . . . The . . . second kind of sweep is not a full search of the premises, but extend[s] only to a cursory inspection of those spaces where a person may be found and should last no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

589 F.3d at 295 (internal citations and quotations omitted).

It is apparent that the sweep of the upstairs bedroom was improper. As noted at the conclusion of the hearing, the police could not articulate any reason to suspect that another person was present in the house, particularly the upstairs bedroom. *United States v. Akrawi*, 920 F.2d 418 (6th Cir. 1990). And although the Sixth Circuit has not had occasion to discuss what might constitute a "space[] immediately adjoining the place of arrest from which an attack could be immediately launched," the second story of a house does not appear to qualify. *See id.* at 421.

But the guns were not found upstairs. They were found in the back bedroom.

The rationale that justifies the first type of sweep allowed by *Buie* is solely the safety of the arresting officers. The Supreme Court explained:

> [T]here is an . . . interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack. The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. A *Terry* or *Long* frisk occurs before a police-citizen confrontation has escalated to the point of arrest. A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover,

> unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.
>
> We recognized in *Terry* that "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." *Terry* [*v. Ohio*], 392 U.S. [1], 24-25 [(1968)]. But we permitted the intrusion, which was no more than necessary to protect the officer from harm. Nor do we here suggest, as the State does, that entering rooms not examined prior to the arrest is a *de minimis* intrusion that may be disregarded. We are quite sure, however, that the arresting officers are permitted in such circumstances to take reasonable steps to ensure their safety after, and while making, the arrest. That interest is sufficient to outweigh the intrusion such procedures may entail.

*Buie*, 494 U.S. at 333-34. The determination, then, whether a sweep is proper must be based on the objective facts viewed as they were presented to the officer on the scene. So viewed, if it appears that the space was so proximate to the location of the arrest that an attack could have been launched or the officer could have been put in peril, the sweep is proper. According to the Supreme Court, "pruden[ce]" is the watchword. *Id.* at 327.

The Sixth Circuit case law suggests that there must be some measure of immediacy to the location of the arrest. A sweep of rooms that are not connected to the arrest site likely will not be justified under the first *Buie* exception. In *United States v. Stover*, 474 F.3d 904 (6th Cir. 2007), defendants Stover and Hinton were convicted of various drug crimes. Federal agents went to Hinton's home to execute an arrest warrant for his arrest. Before entering the home, the agents observed two cars parked in Hinton's driveway, one of which was not registered to Hinton. While approaching Hinton's duplex, the agents saw "that there was a light on in the living room, and they could hear noise, which they later determined to be the television. The officers pounded on the door and announced themselves as police. The door was unlocked, and the officers pushed it open. The

officers could hear movement inside the house. They entered the house, continuing to announce their presence. Shortly after they were inside, Defendant Hinton came down from the upstairs. While Defendant Hinton was being arrested, Defendant Hinton's son came down from the upstairs." *Id.* at 910. After Hinton was arrested, an officer "left to clear the rest of the house" because of the car parked outside. The officer "went from the living room to the adjacent kitchen. Upon entering the kitchen, he opened a doorway that led into the attached garage. When he looked into the attached garage, he could see that towards the back of the garage, there was another room with light coming from it. He cleared the garage area and discovered that there was a laundry room in the back. To the left of the entrance to the laundry room, there was a door to a crawl space, about three feet by three feet large, and light was emanating from the crawl space. [The] [o]fficer . . . cleared the room and found a marijuana growing operation inside the crawl space, which included multiple marijuana plants. Another officer found a handgun in the upstairs that was in plain view." *Ibid.* (footnote omitted). Hinton moved to suppress the evidence on the ground that the search exceeded the permissible scope of a protective sweep, and the district court denied Hinton's motion to suppress. The Sixth Circuit reversed. The court explained:

> The testimony of officer Bellinger reveals that, in order to find the marijuana plants, he had to go through the kitchen, open the kitchen door, enter the attached garage, enter the laundry room, and then lean all the way into the crawl space. Nor was the gun, found upstairs, in the area immediately adjoining the downstairs living room where Defendant Hinton's arrest occurred.

*Ibid.* The court held that neither the marijuana plants nor the gun was in a place that could be considered in the immediately adjoining spaces or rooms. *Id.* at 911.

Contrast that decision with the one in *United States v. Kaler*, 11 F. App'x 400 (6th Cir. 2001). There, police officers "forcibly entered Kaler's hotel room . . . to execute an arrest warrant

for both Kaler and his companion, John Paul Jones." *Id.* at 401. After securing Kaler, Jones, and an unidentified female, "one of the officers pushed open the adjoining bathroom door, turned on the light, stepped into the bathroom, and pushed back the shower curtain," and discovered approximately 5,000 pills in various plastic bags. *Ibid.* The district court denied Kaler's motion to suppress the pills. On appeal, the Sixth Circuit acknowledged that the bathroom constituted an "immediately adjoining space" under *Buie* and held that it was proper for the officer to pull back the shower curtain because the bathtub was large enough to hide an adult. *Id.* at 402.

Other courts provide guidance as well. In *United States v. Thomas*, 429 F.3d 282 (D.C. Cir. 2005), U.S. Marshals went to Thomas's apartment to execute an arrest warrant. The apartment looked like this: "The front door to Thomas' one-bedroom apartment opens immediately into a hallway. A foot or two to the left is the entrance to the living room and to the right are doorways off the hallway leading to the kitchen, bathroom, and bedroom. The bedroom door at the far end of the hall is 15 feet from the entrance to the apartment. 429 F.3d at 284-85. The defendant was apprehended in the hallway immediately inside his front door. The officers then conducted a sweep of the apartment, including the defendant's bedroom, which was located fifteen feet from the entrance to the apartment. *Id.* at 284. The court found the search permissible, reasoning that the entrance to the bedroom was a straight shot down the hallway, and therefore the bedroom was an immediately adjoining space. *Id.* at 287. The court also suggested that if an apartment is small enough, all of it could be searched because every room immediately adjoined the place of arrest and could be used to launch an immediate attack. *Id.* at 287-88.

In *United States v. Lauter*, 57 F.3d 212 (2d Cir. 1995), ATF agents executed an arrest warrant for the defendant at his small, two-room apartment. After the defendant was arrested in the

first room, an agent went into the back room, and a few moments later, returned escorting Lauter's girlfriend out of the backroom. A second agent went into the back room "to 'back up' [the first agent] and to finish 'conducting a security sweep of that room.'" *Id.* at 214. During the sweep, the second agent saw and seized a shotgun protruding from underneath the bed in the back room. The district court denied the defendant's motion to suppress the shotgun, finding that the back room was immediately adjoining the place of arrest. *Ibid.* On appeal, the defendant argued that the protective sweep was impermissibly broad. The court of appeals held that the second agent's sweep was permissible given the small size of the apartment. *Id.* at 217; *see also United States v. Alejandro*, 100 F. App'x 846, 848 (2d Cir. 2004) ("Particularly when a district court finds that an apartment is small, an immediately adjoining room is searchable under the 'protective sweep' exception.").

In *United States v. Lay*, 182 F.3d 911 (4th Cir. June 29, 1999) (table), police officers traveled to Lay's residence to execute an arrest warrant for a murder. After Lay opened the door in response to the officers' knocks, "he was ordered to lie on the floor and asked whether anyone else was in the premises. When he failed to respond, the officers conducted a protective sweep of the entire one-bedroom apartment." 182 F.3d 911, at *1. The officers found drugs in a large locker in the bedroom. The district court denied Lay's motion to suppress based on its finding that "the arrest occurred in 'a small apartment where effectively every room adjoins every other room.'" *Id.* at *2. On appeal, Lay asserted, among other things, that the search of his home was improper because the bedroom was not immediately adjoining the area just inside the front door where the arrest took place. The court of appeals rejected Lay's argument, reasoning:

> The district court's ruling is amply supported by the evidence and is in accord with principles enunciated in *Buie*. One of the arresting officers testified that the distance from the front door through the living room to the bedroom door was fifteen feet. A diagram introduced at the suppression hearing showed that the bedroom did indeed

share a wall with the living room but that the door to the bedroom opened into a hallway rather than directly into the living room. However, the same diagram reveals that someone exiting the bedroom would immediately have full view of the area of the arrest, as much or nearly as much as if the bedroom opened directly into the living room. The clear implication of the court's oral ruling is that the focus of Buie — the possibility of sudden violence to police officers engaged in a dangerous task in unfamiliar territory — militates against the interpretation Lay proposes for the term "immediately adjoining area."

*Ibid.*

In *In re Sealed Case 96-3167*, 153 F.3d 759 (D.C. Cir. 1998), officers followed the defendant into a home to which the officers believed the defendant had forced entry to burglarize. Once he submitted, the officers chased the defendant up a flight of stairs and into a bedroom. The officers led the defendant, who was not handcuffed, into the hallway, patted him down, and took him to the first floor to hand him to other officers that had just arrived. *Id.* at 762-63. One of the officers first on the scene immediately returned to the upstairs bedroom in which the defendant was found, searched the room, and found a bag with several large white rocks and a semiautomatic handgun. The officer went back downstairs and handcuffed the defendant. After handcuffing the defendant, two officers made a cursory examination of the house. In a small bedroom on the second floor, adjacent to the room in which the defendant was apprehended, the officers found a bag containing white rocks and a triple-beam scale. *Id.* at 763. The defendant moved to suppress, and the district court denied his motion, reasoning that the items found in the small bedroom were seized during a valid protective sweep because the small bedroom "'was only a few feet from the larger bedroom door and only a few feet from the top of the stairs,' and 'was a space from which an attack could be immediately launched.'" *Id.* at 770. On appeal, the D.C. Circuit "[saw] no reason to disturb that finding." *Ibid.* (noting that *United States v. Ford*, 56 F.3d 265 (D.C. Cir. 1995) supported the application of *Buie*'s first prong).

The defendant cites *United States v. Ford* for the idea that the back bedroom cannot be considered an immediately adjoining space. That case is factually different. In *Ford*, the officers went to the defendant's apartment to execute an arrest warrant. "Upon entering the apartment, the FBI agent observed [the defendant] in the apartment hallway and arrested him." *Ford*, 56 F.3d at 266. An agent conducted a protective sweep, walking into the bedroom immediately adjoining the hallway in which the defendant was arrested. "Once in the bedroom, the agent spotted a gun clip in plain view on the floor, and, although he realized that there were no people in the bedroom, the agent nevertheless continued to search. He lifted a mattress under which he found live ammunition, money, and crack cocaine, and he lifted the window shades and found a gun on the window sill." *Ibid.* The district court denied the defendant's motion to suppress. On appeal, the court of appeals agreed that the bedroom was a space immediately adjoining the place of arrest, *id.* at 270 ("Because the arrest took place in the hallway, and the bedroom from which Ford emerged was immediately adjoining the hallway, Agent Godfrey could legitimately look in the bedroom for potential attackers."), but held that the officer erred in searching under the mattress and behind the window shades because those were not places an immediate attack could be launched from, *id.* at 266.

The scope of the search in *Ford* certainly exceeded the limits described by the *Buie* court, and to that extent the search was found to be improper. But the guns in this case were not found under a mattress or in an enclosed space. They were in the open in a bedroom within sight of the arrest location. *Ford* tends to support the notion that a bedroom just off a common hallway can amount to an immediately adjacent space.

The factors used by the courts in the cited cases to determine whether a room is immediate to an arrest site include the size of the dwelling, the floor plan layout, the distance from room to

room, and the ease with which one might move from one space to the next. In this case, the officers testified that at most fifteen feet separated the place of arrest and the southwest bedroom where the guns were found in plain view. Officer Smigielski testified that one could cover the distance in two to three strides, and Officer Johns testified that there was a clear view from that bedroom to the living room where the arrest occurred. The Court finds that the southwest bedroom qualifies as a space immediately adjoining the place of arrest from which an attack could be launched. The officers, therefore, were justified in conducting a protective sweep of the southwest bedroom without "probable cause or reasonable suspicion." *Buie*, 494 U.S. at 334.

The officers seized the weapons, which they could lawfully do because they were in plain view. *See United States v. Taylor*, 248 F.3d 506, 512 (6th Cir. 2001) (citing *Horton v. California*, 496 U.S. 128, 136 (1990)).

### III.

The Court finds that the protective sweep of the back bedroom was reasonable under the Fourth Amendment. The firearms that were discovered at that time were in plain view. The officers properly seized them.

Accordingly, the defendant's motion to suppress the evidence [dkt. #14] is **DENIED**.

s/David M. Lawson<br>
DAVID M. LAWSON<br>
United States District Judge

Dated: July 25, 2012

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 25, 2012.

                                       s/Deborah R. Tofil
                                       DEBORAH R. TOFIL